J-A33039-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| KELLY J. HOLLAND | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| PATRICIA D. HOLLAND | |
| Appellant | No. 1436 EDA 2014 |

Appeal from the Decree Entered April 30, 2014
In the Court of Common Pleas of Lehigh County
Civil Division at No.: 2011-FC-1343

BEFORE: LAZARUS, J., WECHT, J., and STRASSBURGER, J.[*]

MEMORANDUM BY WECHT, J.: **FILED JANUARY 26, 2015**

Patricia D. Holland ("Wife") appeals the divorce decree that was entered April 30, 2014. Specifically, Wife challenges the December 31, 2013 order that granted in part a motion filed by Kelly J. Holland ("Husband") to enforce the parties' property settlement agreement ("PSA"). After review, we affirm.

The trial court summarized the factual and procedural history as follows:

The parties married on September 2, 1994. They separated in January 2011 after [Husband] learned that [Wife] ran up credit card bills under his name without his permission or knowledge. The parties subsequently engaged in negotiations pertaining to the distribution of their marital assets and liabilities. Following these negotiations, the parties entered into a [PSA] on October

_____

[*] Retired Senior Judge assigned to the Superior Court.

3, 2011 without the benefit of counsel and prior to formally filing for divorce.

[Husband] filed a divorce complaint on October 20, 2011. [Husband's] sister-in-law, Daniele Holland, who worked as a legal assistant in a law firm in Easton, Pennsylvania, drafted the PSA. Both parties signed the agreement and it was filed with the Clerk's Office on October 31, 2011.

This matter came before the [trial court] based upon [Husband's] Petition for Special Relief, filed on April 30, 2013. The Petition for Special Relief sought enforcement of certain provisions of the parties' PSA. The specific provisions at issue are contained in Paragraph 5, which provides for disposition of the marital residence located in Whitehall Township, Lehigh County, Pennsylvania. After affirming in the prefatory language of Paragraph 5 that the parties acknowledged full and complete disclosure of their respective financial assets, Paragraph 5 reads as follows:

> With respect to said marital property, the parties agree as follows:
>
> A. Marital Residence.
>
> 1) Wife shall refinance the existing mortgage on the martial [sic] residence located at 5007 Foxdale Drive, Whitehall Township, Lehigh County, PA, no later than one (1) year after the date of signing this agreement. Should Wife not refinance the martial [sic] residence within said one (1) year period, martial [sic] residence shall be sold and proceeds shall be divided as designated on attached Exhibit "A".
>
> 2) Upon refinancing, Husband and Wife agree to divide the proceeds as designated on attached Exhibit "A" . . . .

Exhibit A provides:

> Items to be paid out of the proceeds of the refinancing of the martial [sic] property[.] Figures are approximate value as of the drafting of this agreement and final value to be determined at the time of final settlement.

- 2 -

|  | Husband | Wife | to be paid off |
|---|---|---|---|
| Mortgage | (29,235.00) | (29, 235.00) | 58,470.00 |
| Home equity |  | (52,931.55) | 52,931.55 |
| [Bank of America] |  | (6,764.31) | 6,764,31 |
| Discover |  | (7,730.86) | 7,730.86 |

[Husband's] Petition for Special Relief sought enforcement of Paragraph 5A's language requiring [Wife] to sell the home because she has not been able to refinance the mortgage on the marital residence within one year of signing of the PSA, and to subsequently distribute one-half of the net proceeds from the sale of the house to [Husband] after retirement of the mortgage debt.

On December 31, 2013, the [trial court] entered an order granting [Husband's] motion in part. In that order, the [trial court] enforced the PSA to require an even and equal distribution of the net proceeds from the sale of the marital home after payment of the mortgage debt.

On January 28, 2014, [Wife] filed a Notice of Appeal from the December 31, 2013 order. The case was docketed at 436 EDA 2014. [Wife] filed a Concise Statement pursuant to Pa.R.A.P. 1925(b) on February 12, 2014. [The trial court] issued its 1925(a) Opinion on March 4, 2014. In that opinion, the [trial court] noted that it believed the appeal was improper and was premature pursuant to *Fried v. Fried*, 501 A.2d 211 (Pa. 1985).

On March 6, 2014, the Superior Court entered an order quashing the appeal because no divorce decree was entered yet, thereby rendering the appeal interlocutory consistent with [the trial court's] observation in its opinion.

On March 25, 2014, [Husband] filed an Amended Complaint in Divorce. On March 31, 2014, [Wife] filed a petition seeking [entry of] the divorce decree.

Prior to the entry of the divorce decree, on April 8, 2014, the [trial court] heard [Husband's] oral motion for a protective order. Because the marital residence was a matter for equitable distribution and equitable distribution was subject to an appeal,

[Husband] sought an order precluding [Wife] from allowing the marital residence to fall into disrepair. [Wife] is currently residing in the marital residence. Because it may be subject to a sale in the event [Wife] failed to comply with the refinancing requirements of the PSA, [on April 24, 2014,] the [trial court] ordered that she maintain the property to prevent it from falling into disrepair.

The divorce decree was entered on April 30, 2014. Following the entry of the divorce decree, [Wife] filed a new Notice of Appeal on May 9, 2014.

Trial Court Opinion ("T.C.O."), 8/1/2014, at 1-4. On August 1, 2014, the trial court then filed its second Rule 1925(a) opinion.

Wife raises the following issues for our review:

A. Whether the trial court impermissibly re-crafted the parties' [PSA] which the trial court found was fraudulently prepared and that the parol evidence introduced, over the objection of both parties, was not helpful in clarifying the intent of the parties or the language of the agreement?

B. Whether the trial court erred and misapplied the law in failing to consider the entire [PSA] and arriving at its decision of December 31, 2013?

C. Whether the trial court erred by ordering Husband to continue to make the mortgage payments in lieu of child support which is tantamount to returning, in part, the child support paid by Husband?

D. Whether the trial court erred in entering the order of April [24], 2014, and inserting terms into the [PSA] which were not contained therein, specifically, imposing upon Wife an obligation to be solely responsible for "any and all costs of repair, upkeep or maintenance on the marital residence throughout the timeframe consistent with this Order[")]?

Wife's Brief at 6.

Our standard of review is well settled:

When interpreting a marital settlement agreement, "the trial court is the sole determiner of facts and absent an abuse of discretion, we will not usurp the trial court's fact-finding function." **Chen v. Chen**, 840 A.2d 355, 360 (Pa. Super. 2003), *appeal granted in part*, 578 Pa. 433, 853 A.2d 1011 (2004). On appeal from an order interpreting a marital settlement agreement, we must decide whether the trial court committed an error of law or abused its discretion.

> "[J]udicial discretion" requires action in conformity with law on facts and circumstances before the trial court after hearing and due consideration. Such discretion is not absolute, but must constitute the exercises of sound discretion. This is especially so where, as here, there is law to apply. On appeal, a trial court's decision will generally not be reversed unless there appears to have been an abuse of discretion or a fundamental error in applying correct principles of law. An "abuse of discretion" or failure to exercise sound discretion is not merely an error of judgment. But if, in reaching a conclusion, law is overridden or misapplied, or the judgment exercised is manifestly unreasonable or lacking in reason, discretion must be held to have been abused.

> **In re Deed of Trust of Rose Hill Cemetery Ass'n Dated Jan. 14, 1960**, 527 Pa. 211, 216, 590 A.2d 1, 3 (1991) (internal citations omitted). "Because contract interpretation is a question of law, this Court is not bound by the trial court's interpretation." **Chen**, *supra* at 360. "Our standard of review over questions of law is *de novo* and to the extent necessary, the scope of our review is plenary as [the appellate] court may review the entire record in making its decision." **Kripp v. Kripp**, 578 Pa. 82, 91 n.5, 849 A.2d 1159, 1164 n.5 (2004). However, we are bound by the trial court's credibility determinations. **Wade v. Huston**, 877 A.2d 464 (Pa. Super. 2005).

**Stamerro v. Stamerro**, 889 A.2d 1251, 1257-58 (Pa. Super. 2005) (footnote and some internal citations omitted).

We also note that:

> In Pennsylvania, we enforce property settlement agreements between husband and wife in accordance with the same rules

applying to contract interpretation. A court may construe or interpret a consent decree as it would a contract, but it has neither the power nor the authority to modify or vary the decree unless there has been fraud, accident or mistake. . . .

It is well-established that the paramount goal of contract interpretation is to ascertain and give effect to the parties' intent. When the trier of fact has determined the intent of the parties to a contract, an appellate court will defer to that determination if it is supported by the evidence.

When construing agreements involving clear and unambiguous terms, this Court need only examine the writing itself to give effect to the parties['] understanding. The court must construe the contract only as written and may not modify the plain meaning of the words under the guise of interpretation. When the terms of a written contract are clear, this Court will not rewrite it or give it a construction in conflict with the accepted and plain meaning of the language used. Conversely, when the language is ambiguous and the intentions of the parties cannot be reasonably ascertained from the language of the writing alone, the parol evidence rule does not apply to the admission of oral testimony to show both the intent of the parties and the circumstances attending the execution of the contract.

A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. The court must determine as a question of law whether the contract terms are clear or ambiguous. When acting as the trier of fact, the court also resolves relevant conflicting parol evidence as to what was intended by the ambiguous provisions, examining surrounding circumstances to ascertain the intent of the parities.

*Lang v. Meske*, 850 A.2d 737, 739-40 (Pa. Super. 2004) (quoting *Osial v. Cook*, 803 A.2d 209, 213-14 (Pa. Super. 2002)) (citations omitted).

In her first issue, Wife argues that the PSA was unambiguous, but the trial court nonetheless revised the parties' PSA to provide Husband with a share of the proceeds of the marital residence. Wife contends that the trial court failed to consider the drafter's fraud in construing the PSA, and Wife

- 6 -

asserts that she raised the issue of fraud in her Answer and Counterclaim. Wife's Brief at 12-18. Wife also argues that the trial court failed to consider the PSA as a whole, and particularly Wife's waiver of alimony and her interest in Husband's retirement benefits. Wife claims that waiver of alimony was in consideration for Wife receiving the proceeds of the marital residence. Wife's Brief at 19-20.

Husband responds that the trial court did not find the PSA to be fraudulent, but found only that the drafter provided fraudulent services after the PSA was signed and completed. Husband contends that the trial court properly found the language of the PSA to be ambiguous, then took testimony and resolved the conflict in the testimony to determine the parties' intent. Husband's Brief at 11-15.

We first address whether the trial court correctly concluded that the PSA was ambiguous, and then we review the court's interpretation of the PSA. The trial court acknowledged that neither party believed the PSA to be ambiguous, despite each party providing diametrically opposed interpretations of the PSA. Trial Court Memorandum and Order ("T.C.M."), 12/31/2013, at 4. However, the trial court found the language to be "imprecise" and permitted the parties to present testimony regarding the parties' intent. *Id.*

Initially, we agree with the trial court that the PSA is ambiguous. A contract is ambiguous when it can be understood in more than one way. *Lang*, *supra*. The PSA provides that Wife shall refinance the property within

one year and if she does not do so, the marital residence will be sold. Property Settlement Agreement ("PSA"), 10/31/2011, at 4-5. Whether refinanced or sold, the PSA directs that the proceeds are to be divided "as designated on attached Exhibit 'A.'" *Id.* at 5. Exhibit A lists "[i]tems to be paid out of the proceeds of the refinancing of the marital property" and then lists two columns of debts, with the mortgage split between the columns of Husband and Wife and the home equity line of credit and two credit cards listed in Wife's column. *Id.* at 15. Taken together, this could mean that the money received from the house will be divided between Husband and Wife with each individually responsible for the debts listed in their respective columns and keeping however much was left. It also could mean that the parties will pay the debts and then divide the proceeds after the debts were paid. Because Exhibit A does not indicate how to distribute any money remaining after the debts are paid, it does not speak clearly to those remaining proceeds.[1] Thus, the trial court properly concluded that the PSA was ambiguous and took testimony relative to the parties' intent.

Next, we address the trial court's interpretation of the PSA. The court considered the following evidence:

---

[1]   The trial court found the PSA ambiguous because it believed that the PSA was "reasonably susceptible to" either Husband's assertion that the PSA called for equal division of the net proceeds or to Wife's contention that the PSA called for Wife to retain the marital residence mortgage-free and without any allocation to Husband. T.C.O. at 7.

[Husband] testified the parties separated in January 2011 after he learned [that Wife] ran up credit card bills under his name without his permission or knowledge. In approximately May of 2011, [Husband] asked [Wife] how much was in their joint savings account and how much was owed on the home equity loan as well as for their daughter's braces payments. [Wife] told [Husband] they had about $20,000 in savings. She estimated about $5,000 was owed on the home equity loan and about $1,000 for the braces. [Husband] suggested using the funds from the savings account to pay off those two debts and to evenly split the remaining sum from the savings account. When these bills remained unpaid, [Husband] pulled his credit report and found out [Wife] had increased the amount of the home equity loan to $70,000, had settled a credit card debt for less than was owed, and that two other credit cards were used excessively.

\* \* \*

According to [Husband], the parties took out a home equity loan solely for the purpose of purchasing a new vehicle for [Wife's] use. This home equity loan was in the amount of $31,000. After learning of the huge increase in credit card bills, [Husband] also discovered the home equity loan had not been reduced from the original $31,000 taken out and paid down over the ensuing months, but instead had been increased to $70,000. [Husband] claimed he did not know about the increase in the home equity loan or the amount of credit card debt incurred by [Wife].

The property settlement agreement was purportedly reached after a series of proposals exchanged by the parties. In [a July 13, 2011 email (Exhibit P-1), Husband] made his first proposal. [Husband] suggested he should retain the marital residence and live there with the parties' two children while [Wife] moved out. . . . [Wife] did not respond to this offer.

According to [Husband, Wife] responded to [Husband's] second offer for settlement of the marital estate with her own proposal that she would remain in the marital home with the children, refinance the mortgage on the house, and buy out [Husband's] share of the equity. [Husband] had refined his original proposal in a handwritten note to Daniele Holland, introduced at trial as Exhibit P-3. In this offer, which was subsequently conveyed to [Wife] by way of an e-mail from Daniele Holland to [Wife] on July 22, 2011, [Wife] would buy out [Husband's] interest in the

marital home. As the language of P-3 indicates, [Wife] would have one year to refinance the mortgage, and [Husband] would continue to pay the mortgage until the refinancing was completed. The parties further negotiated that [Husband] would continue to pay the monthly mortgage amount on the house instead of paying child support. The arrangement was that when the oldest child turned 18 and graduated from high school, [Husband's] monthly mortgage obligation would be cut in half.

[Husband] further testified he used the services of his sister-in-law Daniele Holland as a conduit for negotiations with [Wife]. Daniele Holland was employed as a legal assistant with a law firm in Easton, Pennsylvania, and drew up various property settlement proposals after communicating and transmitting offers and counteroffers between the parties. In drafting the final language for the property settlement agreement, Daniele Holland worked from a template of property settlement agreements used in the law office where she worked. Based on the negotiations of the parties, [Wife] agreed to assume a disproportionate amount of the marital debt. According to [Husband, Wife] agreed to assume this much of the debt to "right her wrongs." As a result, under the terms of Exhibit A referenced above, [Wife] agreed to be responsible for one-half of the remaining mortgage debt, and to assume full responsibility for the balance owed on the home equity loan and the two credit cards (Bank of America and Discover).

\* \* \*

Exhibit P-2 is an important element of consideration by the [trial court] in the current dispute. The e-mail exchange seems to dictate the terms of the agreement between the parties, later found word for word in Exhibit P-5[, a draft of the PSA], as well as the parties' own acknowledging comments. . . . Exhibit P-2 then appears to include [Wife's] acceptance of the proposed distribution of assets from disposition of the marital residence and assumption of debts by the parties.

\* \* \*

When asked the purpose of the home equity loan, [Wife] testified the funds obtained through the home equity loan were used to pay for a motor vehicle as well as family vacations, personal item purchases and credit card payments. [Wife] testified [that Husband] was completely aware of the total

amount of the home equity loan and the amounts incurred from credit card spending.

[Wife] testified she agreed to pay off a disproportionate amount of the martial debts because, "it would make [Husband] happy." She further testified that her understanding of the terms of the [PSA] was that if she was paying off the debts, this allowed her to get the house if she waived any claim to alimony and [Husband's] pension benefits. . . . [Wife] asserted she did not understand the [PSA] required her to relinquish half the net value to [Husband] but instead, she "would be receiving the house." [Wife] stated she never heard of the proposition that [Husband] would receive one-half of the proceeds from the sale of the house after payment of debts until the litigation began.

\* \* \*

[The trial court] does not find Daniele Holland a credible witness at any level. . . . In addition, the [trial court] does not find either party particularly persuasive in their own testimony. [Husband] was surprisingly vague and hesitant when testifying about the circumstances leading to his initial proposal, counterproposal, and eventual agreement to the language in the property settlement. [Wife] was unbelievable in her assertion she could not recall the events leading up to a second home equity loan application which nearly doubled the amount of the home equity debt encumbering the marital residence.

T.C.M. at 4-6, 8, 12-13, 15-16 (citations to notes of testimony omitted).

After considering the evidence, the trial court concluded that Wife had entered an agreement to assume the majority of the debt and that Husband was to receive half of the proceeds of the marital residence. *Id.* at 17. The court provided Wife six months during which she could refinance the mortgage and provide Husband with his share of the equity. If the house could not be refinanced, it was to be listed for sale with the proceeds of sale to be split between the parties. The trial court stated:

The PSA is entirely silent on the *timing* of the distribution of the proceeds. In other words, within the four corners of the agreement, there is no indication whether the proceeds should be divided before or after paying off the expenses denoted in Exhibit A. However, the [trial court] found that the notion of "proceeds" bears only one logical meaning.

[Husband] testified that the essential goal of the parties' PSA with respect to [Wife] assuming a disproportionate amount of debt was for [Wife] to "right her wrongs." This is corroborated by Exhibit A, by which [Wife] agrees to assume one half of the mortgage as well as the credit card bills for the couple's Bank of American and Discover cards and the home equity loan.

If the marital residence is sold, after expenses attendant to the sale, there remains a corpus of funds. The [trial court] interpreted the PSA as dividing that corpus evenly. Each individual would receive fifty percent of the funds after the sale from which the parties would pay their respective debts under Exhibit A. This is the only way by which [Wife] can properly retire the share of the mutual debt that she agreed to assume. [Wife] argues that the agreement required the debts to be paid from the purchase amount before distribution of funds to the parties from the sale. Such an interpretation is inconsistent with the parties' purpose and intent as described in Exhibit A to assign the payment of certain liabilities to one party or the other. [Wife's] interpretation would serve to contradict and frustrate the purpose of the PSA.

T.C.O. at 11 (citations to record omitted; emphasis in original).

Based upon the record before us, we agree with the trial court. The interpretation most consistent with the parties' memorialized discussions is that Wife intended to assume a larger share of the debt because she incurred most of it, and Husband would receive his equal share of the equity in the marital residence.

Wife also contends that Daniele Holland's fraud should invalidate the agreement. The trial court acknowledged that Ms. Holland was not a

credible witness. She testified that she prepared the PSA under the supervision of her employer, an attorney. However, that attorney testified that he never met with Husband and had never opened a file related to this case. The attorney and his office manager also testified regarding other misconduct by Ms. Holland that was unrelated to this case. T.C.M. at 10-11.

While there is no doubt that Ms. Holland acted wrongfully, the trial court did not, as Wife suggests, find that Ms. Holland defrauded Wife.[2] Additionally, Wife does not argue that the PSA does not represent the parties' agreement. She argues that the trial court either misinterpreted the PSA or added conditions to it that were not found in the PSA itself. Regardless, the trial court did consider Ms. Holland's actions, and gave Wife six additional months to attempt to refinance the house partly as a result of to those actions. T.C.M. at 18; T.C.O. at 9. We find no merit in Wife's argument.

With regard to Wife's argument that the court failed to consider her waiver of alimony in interpreting the PSA, the trial court heard evidence regarding the negotiations of the PSA and reasonably determined the

---

[2] Wife's citation in support of this claim is misplaced. The trial court believed Daniele Holland may have committed perjury in connection with an allegation that she forged a judge's signature in a different case and ordered that the hearing transcripts be forward to the district attorney for investigation. T.C.M. at 15 n.2.

parties' intent. The record supports the court's determinations and we find no error.

In her next issue, Wife asserts that the trial court erred in permitting Husband to pay the mortgage on the marital residence in lieu of child support. Wife claims that the trial court erred in concluding that Wife benefited more from the mortgage payments than she would have from child support because the trial court did not have sufficient evidence to make such a conclusion. Wife's Brief at 21-22.

Husband responds that the parties agreed that Husband would make the mortgage payments in lieu of child support until Wife refinanced the marital residence. After refinancing, Husband would pay the amount directly to Wife until the older child was emancipated, at which time, the parties agreed that Husband's payment to Wife would be halved. Husband contends that this did not bargain away the children's right to child support, but merely specified the method of payment. Husband's Brief at 20-21.

To the extent that Wife argues that the court did not adequately consider the child support provision as part of the PSA as a whole, as noted above, we find no error in the trial court's resolution of the interpretation of the marital residence clause of the PSA. However, to the extent that Wife argues the trial court should have modified the child support agreement, we provide the following discussion.

With regard to the validity of support agreements, we have stated:

Parties to a divorce action may bargain between themselves and structure their agreement as best serves their interests, . . . They have no power, however, to bargain away the rights of their children[.] . . . Their right to bargain for themselves is their own business. They cannot in that process set a standard that will leave their children short. Their bargain may be eminently fair, give all that the children might require and be enforceable because it is fair. When it gives less than required or less than can be given to provide for the best interest of the children, it falls under the jurisdiction of the court's wide and necessary powers to provide for that best interest. . . . [The parties' bargain] is at best advisory to the court and swings on the tides of the necessity that the children be provided.

*Kraisinger v. Kraisinger*, 928 A.2d 333, 340-41 (Pa. Super. 2007) (quoting *Knorr v. Knorr*, 588 A.2d 503, 505 (Pa. 1991)) (modifications in original).

The trial court implicitly may have found the child support agreement to be fair. T.C.M. at 18. However, the trial court did not consider the parties' incomes or the applicable guideline support obligation as required by *Kraisinger*. Unfortunately, Wife did not raise the issue of a modification of child support properly. To seek a modification of child support, one must file a petition for modification that "specifically aver[s] the material and substantial change in circumstances upon which the petition is based." Pa.R.C.P. 1910.19(a). The record does not demonstrate that Wife ever filed a petition for modification or a complaint for child support. While Wife claims that she raised the issue in her counterclaim to Husband's petition for special relief, that counterclaim only addressed alimony and retirement benefits, not the issue of child support. In our review of the transcript, Wife never raised child support, except that, in closing arguments, Wife's attorney

- 15 -

asks the court to consider the mortgage payments in lieu of child support in its interpretation of the PSA. Notes of Testimony ("N.T."), 9/19/2013, at 85-86. Because Wife never requested relief or filed for a modification of the child support indicated in the PSA, the court could not have erred in failing to address that issue.[3]

Finally, Wife asserts that the trial court erred in entering its April 24, 2014 order which restrained Wife from selling the marital residence during the pendency of the appeal and directed Wife to maintain the residence. Wife argues that the requirements that she be responsible for the maintenance, upkeep, and repair of the marital residence are conditions that do not appear in the PSA. Wife contends that the trial court erred by imposing conditions to which the parties did not agree. Wife's Brief at 23-24. Husband responds that the order merely stated the standard practice that the person in the residence is responsible for it. Husband's Brief at 22.

On April 8, 2014, the parties appeared before the trial court to request the divorce decree. At that time, Husband, appearing *pro se*, made an oral request for an order that Wife not sell or transfer the marital residence and continue to maintain it pending the resolution of any appeal. N.T., 4/8/2014, at 6. Wife's attorney represented that she had no objection to

---

[3]   Notwithstanding our ruling, we intend no prejudice to Wife's right to file a petition to modify support in the future.

such an order. *Id.* at 7. On April 24, 2014, the trial court entered the order

that Wife:

> is prohibited from transferring or encumbering with any further debt obligation the marital home . . . without [Husband's] consent. Furthermore, [Wife] is prohibited from damaging or allowing the marital home to deteriorate or fall into disrepair during the pendency of any litigation or appeal in the within matter. [Wife] is responsible for any of the costs for repair, upkeep, or maintenance on the marital home throughout that timeframe consistent with this Order.

Order, 4/24//2014, at 1.

> The trial court explained its decision as follows:
>
> [Husband's] request, in essence, was that while [Wife] continues living in the marital residence during the pendency of the appeal and refinancing procedures, and while [Husband] has responsibility to pay the mortgage expenses, [Wife] should be precluded from allowing the market value of the home to drop by not performing basic maintenance on the property.
>
> * * *
>
> In this case, the [trial court] took the parties' respective interests into consideration and entered an order it deemed appropriate to maintain the status quo during the pendency of any appeal. While [Wife] is residing in the marital residence, if she were to allow the home to fall into a state of disrepair, it would adversely impact the value at such a time as the residence must be sold. Such a result would cause an economic inequity upon both parties, not just [Husband]. The [trial court's] Order of April [24], 2014 served to maintain the status quo. Because [Wife] is residing therein, responsibility was placed upon her to bear any costs attendant to problems that may arise with the residence. This does not preclude her from filing any subsequent petition for special relief in the event something major were to occur with the property which falls outside her control and for which [Husband] should bear some financial responsibility. Instead, the responsibilities placed upon [Wife] by [the trial court's] order are consistent with those

- 17 -

responsibilities assumed by any homeowner – to maintain the premises.

T.C.O. at 15.

As noted, Wife did not object to Husband's oral motion or the court's statement that it would enter an order granting Husband's request. N.T., 4/8/2014, at 7. The failure to object to an alleged error waives that issue for purposes of appeal. *See* Pa.R.A.P. 302(a); ***Commonwealth v. Helsel***, 53 A.3d 906, 919 n.11 (Pa. Super. 2012). However, one issue was included in the order that was not raised in open court: that Wife be responsible for the costs of upkeep. Because Wife had no opportunity to object, we do not find this particular issue waived. However, given that Husband was making the mortgage payments and Wife was living in the marital residence, we agree with the trial court that it was equitable for Wife to handle the upkeep, especially as Wife could petition the court for relief should unanticipated expenses arise. Support for such a position can be found in the fair rental value offsets of marital property when the non-possessing spouse may receive credit for fair rental value due to his or her ownership interest in the marital residence, but such rental value may be offset by the non-possessing spouse's share of the expenses for upkeep and debt service. ***See Lee v. Lee***, 978 A.2d 380, 385-86 (Pa. Super. 2009). Here, the trial court similarly balanced the financial responsibility for the marital residence between Husband and Wife and we find no error.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/26/2015